FILED

SHELBY COUNTY
CHANCERY COURT

NOV 17 2014

L. RUSSELL, C & M

BY:

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| MARVELL MITCHELL and | ) | |
| LEDELLE MITCHELL | ) | |
| | ) | |
| Plaintiffs. | ) | |
| | ) | |
| VS. | ) | Docket No. CH-14-1680-1 |
| | ) | |
| NEW PENN FINANCIAL, LLC d/b/a | ) | |
| SHELLPOINT MORTGAGE | ) | |
| SERVICING; BANK OF NEW YORK | ) | |
| MELLON f/k/a BANK OF NEW | ) | |
| YORK, AS TRUSTEE FOR THE | ) | |
| HOLDERS OF THE CERTIFICATES | ) | |
| CWMRS, INC, CHL MORTGAGE | ) | |
| PASS THROUGH TRUST 2005-11, | ) | |
| MORTGAGE PASS THROUGH | ) | |
| CERTIFICATES SERIES 2005-11 | ) | |
| Bank of AMERICA, N.A.; | ) | |
| RECONTRUST COMPANY, N.A.; | ) | |
| and WEISS SPICER CASH, PLLC | ) | |
| | ) | |
| Defendants. | ) | |

---

## PETITION TO ENJOIN FORECLOSURE SALE AND
## COMPLAINT FOR DAMAGES

---

TO THE CHANCELLORS OF THE CHANCERY COURT FOR THE THIRTIETH

JUDICIAL DISTRICT:

COME NOW the Plaintiffs, Ledelle and Marvell Mitchell, by and through legal counsel,

Brewer & Barlow PLC, Webb Brewer and Steve Barlow, and file their Petition and Complaint

and state as follows:

### I.    Preliminary Statement

1. Plaintiffs Ledelle and Marvell Mitchell bring this Petition to Enjoin Foreclosure Sale

1

EXHIBIT

A

for rescission and restitution for fraud in the inducement of a loan transaction and Complaint for Damages pursuant to the Truth in Lending Act and Regulation Z promulgated thereunder; *12 C.F.R.§ 226.39;* for breach of contract and breach of the covenant of good faith and fair dealing attendant thereto; violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-101 *et seq.;* and for violations of the Fair Debt Collection Practices Act, 15 U.S.C.§ 1692, *et seq.*.

## II.   Jurisdiction and Venue

2. Jurisdiction is conferred on this Court by T.C.A. § 16-11-101.

3. Venue is proper in this Court as the claim arose in this District.

## Parties

4. Plaintiff, Ledelle Mitchell ("Mrs. Mitchell"), is a citizen and resident of Shelby County, Tennessee and resides at 9375 Zachariah Cove, Memphis, Tennessee 38133. She is the wife of Marvell Mitchell.

5. Plaintiff, Marvell Mitchell ("Mr. Mitchell"), is a citizen and resident of Shelby County, Tennessee and resides at 9375 Zachariah Cove, Memphis, Tennessee 38133. He is the husband of Ledelle Mitchell.

6. Defendant New Penn Financial, LLC, *d/b/a Shellpoint Mortgage Servicing* ("Shellpoint") is a foreign corporation, duly registered with the Tennessee Secretary of State. Its registered agent for service of process is National Registered Agents, Inc., 800 Gay Street, Suite 2021, Knoxville, Tennessee 37929.

7. Defendant, Bank of America, N.A. ("BOA"), is a corporation organized and existing under the laws of the State of Delaware. Its principle offices are at 100 North Tryon Street, Charlotte, North Carolina, 28255. At all relevant times, BOA has transacted

and continues to transact business in Memphis and Shelby County, Tennessee. BOA does not have a registered agent for service of process in Tennessee.

8. The Bank of New York Mellon Corporation F/K/A the Bank of New York, as Trustee is a financial services company that specializes in asset management. Upon information and belief, it serves as Trustee for a mortgage-backed security loan pool which owns the Mitchell's mortgage loan. The Bank of New York Mellon Corporation is not registered with the Tennessee Secretary of State and does not have a registered agent for service of process in the State of Tennessee. Its principal offices are located at One Wall Street, New York, New York, 10286.

9. Recontrust Company, N.A., ("Recontrust") is a wholly owned subsidiary of Bank of America, N.A. and is headquartered in Simi Valley, California. It specializes in non-judicial foreclosure sales. and provided a Fair Debt Collection Practices Act notice to the Plaintiffs on behalf of the owners of the beneficial interest of the power of sale in the Mitchell's Deed of Trust; however, it did not respond to Mr. Mitchell's request for validation of the validity and amount of debt as required by law.

10. Defendant Weiss Spicer Cash, P.L.L.C. ("Weiss Spicer Cash") is a domestic Professional Limited Liability Company duly licensed in the State of Tennessee. Its registered agent for service of process is Arnold M. Weiss, 208 Adams Avenue, Memphis, Tennessee 38103. No claim is asserted against Weiss Spicer Cash; however, as Substitute Trustee in a threatened foreclosure sale of property that is the subject of this lawsuit, it is an indispensable party pursuant to Rule 19 of the Tennessee Rules of Civil Procedure.

### IV. Factual Allegations

3

11. The Plaintiffs purchased their home at 9375 Zachariah Cove, in Memphis in approximately 2002.

12. They paid approximately $525,000 for the property, and financed the sale through a short-term line of credit.

13. The Plaintiffs owned a home in Germantown, Tennessee, at the time and purchased the property at 9375 Zachariah Cove in a distressed sale because it was in foreclosure.

14. They had been looking for a good long-term loan to refinance the quick financing arrangement they had originally obtained.

15. Mr. Mitchell received a call from a former co-worker, who had gone into the mortgage business, about a good financing opportunity.

16. He had previously mentioned to him his need to get long-term financing for his new home.

17. Mr. Mitchell believed the man, whose name is Irving Smith, worked as a loan officer for Countrywide Home Loans, Inc. ("Countrywide").

18. Mr. Smith encouraged Mr. Mitchell to choose a Countrywide loan product, which he said would allow Mr. Mitchell to pay interest only for ten years and then convert to an amortizing loan for the remainder of the thirty-year loan term.

19. Mr. Smith knew that Mr. Mitchell had made extra payments on the mortgage on his prior home to reduce the principal ahead of the amortization schedule.

20. He emphasized to Mr. Mitchell that he would save money by obligating himself to only pay monthly interest and then make substantial principal reduction payments as he was able.

21. Mr. Mitchell relied on the advice of Mr. Smith, believing that he had special expertise

4

in mortgage lending, had thorough knowledge of the best available Countrywide products as a loan officer, and was looking for his best interest because of their past friendship.

22. On December 31, 2004, the Plaintiffs refinanced their home at 9375 Zachariah Cove, Memphis, Tennessee 38133, based upon the guidance of Mr. Smith.

23. As it turned out, Mr. Smith was apparently a mortgage broker for AME Financial Corporation ("AME"), a Norcross, Georgia company. The loan was arranged by AME, although Mr. Mitchell did not really focus on the significance of that fact at the time.

24. The principal amount of the new loan was $611,000.00; of which $608,879.71 was paid to EverHome Mortgage Company to pay off the existing indebtedness.

25. The Plaintiffs paid $4,916.94 at the closing, according to the "HUD 1" Settlement Statement, and were charged $6,966.73 in closing charges.

26. Significantly, there is no loan origination fee or broker's fee disclosed on the settlement statement. Instead, a line item described as "Yield Spread Premium" states "Broker pd. by Lender". Mr. Mitchell did not know what a "yield spread premium" was at that time and, again, did not focus on the significance of this detail.

27. The Plaintiffs have no idea how much was paid to Mr. Smith or AME Financial Corporation by Countrywide, the lender; however, in subprime lending a "yield spread premiums" was a euphemism for a kick-back or excessively generous broker fee for an especially profitable high-cost loan that was destined for bundling into a mortgage-backed security pool.

28. The loan is evidenced by a highly confusing document labeled as an "InterestOnly

ADJUSTABLE RATE NOTE". (The Note is attached as "Exhibit A" to the Complaint.)

29. Despite the label, the Note calls for a thirty-year loan term with fixed interest-only payments for a ten-year period and then conversion to an adjustable interest rate for an additional twenty years.

30. According to the Note, not only the interest rate changes at the first "change date" in February, 2015, but the loan converts to an amortizing loan with monthly principal payments calculated to pay off the principal indebtedness over the remaining twenty years of the loan.

31. The initial interest rate was 5.375%, but based upon a LIBOR index could increase to a ceiling of 10.375%. After the initial change date, the rate is subject to annual changes. After the first "change date" the interest rate would be adjusted annually to 2.250 above the current LIBOR index.

32. The initial monthly payments called for in the Note were $2,736.77, which did not include an escrow account for taxes and insurance.

33. At the closing, Mr. Mitchell signed an Escrow Waiver form, which clearly showed that he had responsibility for paying the real estate taxes on the property as well as the mandatory insurance coverage.

34. Both the Note and the Deed of Trust executed to secure the debt identified AME Financial Corporation as the lender and the entity holding the beneficial interest in the power of sale clause in the Deed of Trust; however, a document given to the Plaintiffs at closing states that the loan/ servicing had been transferred to Countrywide Home Loans, Inc. and that payments should be sent to its payment center beginning on

March 1, 2015.

35. The assertion that AME Financial Corporation was the initial lender is also contradicted by Line 814 on the Settlement Statement, which states "Broker pd. by Lender". Presumably, this means that AME Financial Corporation, or Mr.Smith was paid by Countrywide.

36. Under the terms of the Note, the Plaintiffs would pay $328,412.40 in interest, without having reduced the principal at all before the first change date and then would recommence paying interest on the entire loan balance in addition to making principal payments on a twenty- year amortization schedule.

37. If the interest rate remained the same over the entire loan period, the Plaintiffs would be required to pay $998,393.11 in interest over the remaining twenty years of the term of the loan. This would result in a total interest payment of $1,326,805.51 over the life of the loan, in addition to repayment of the principal balance of $611,000.00, for a total payoff of $1,937,805.51.

38. . By contrast, the Federal Truth- in- Lending Disclosure Statement provided to the Plaintiffs at the closing estimated the total finance charge to be $670,604.09 and the total of payments to be $1,276,034.21. (The Disclosure Statement is attached as "Exhibit B" to the Complaint.)

39. It is difficult to understand what assumptions as to future interest rates were made to reach those figures.

40. Similarly, the Disclosure Statement provides that payments would go from $2,736.77 to $3,948.43 upon the change date after ten years from the inception of the loan.

41. Mr. Smith down played the disclosed estimated $1200.00 payment increase by

emphasizing that the principal balance would have been paid down substantially.

42. Given that monthly principal payments of $2,545.83 would be required to pay the principal balance over the remaining twenty-year term of the loan, this estimate appears to be based upon a very unrealistic interest rate after the change date.

43. Again, assuming that the interest rate remained the same the monthly payments would likely be in excess of $5,000.00 per month.

44. Upon information and belief, no underwriting was done to determine the Plaintiffs' ability to pay the likely increase in monthly payments after the initial change date.

45. Although he is a successful businessman and owner of an information and technology company, Mr. Mitchell did not realize the extent to which the Note he signed would likely result in increased interest payments over the life of the loan or the extent of the likely increase in monthly payment amounts upon reaching the initial change date.

46. The Plaintiffs did not know that Mr. Smith, who had recommended the loan to him and on whose advice he relied, was being paid an incentive by Countrywide for getting them to take this loan.

47. Neither did they realize that Countrywide had embarked on a callous strategy to push risky, high-cost loans on consumers like them.

48. In or about 2004 Countrywide set out to maximize its profits by doubling its share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the secondary market.

49. This strategy followed a national trend in which lenders that had previously originated loans for retention in their own portfolios began to generate as many mortgages as possible for sale on the secondary market.

50. Countrywide implemented this deceptive scheme by the use of misleading market practices designed to sell risky, high-cost home loans to homeowners who did not understand the dangers and excessive costs of the loans.

51. Some of the deceptive practices employed by Countrywide included claiming to be the nation's largest lender to build trust with consumers; encouraging borrowers to refinance with complicated mortgage instruments like payment option adjustable rate mortgages (Pay Option ARMs) that were extremely difficult for consumers to understand, and marketing these complex loan products by emphasizing very low "teaser" rates while obfuscating or misrepresenting later steep monthly payment and interest rate increases.

52. Countrywide also created a high-pressure sales environment that forced branch managers and loan officers to meet high production goals and close as many loans as possible without regard to the borrower's ability to repay the loan.

53. This high-pressure environment also led loan officers to push the riskiest kinds of loans, such as pay option adjustable rate mortgages, because they could sell them by deceptively focusing the borrower's attention on the low initial monthly payments and interest rates.

54. The primary goal of Countrywide's deceptive scheme was to provide the secondary market with as many loans as possible, ideally those that would earn the highest premiums because of their high interest rates and other exploitative features.

55. Most of these loans were sold as mortgage-backed securities or whole loan pools. Countrywide tailored its loan products and marketing strategies to satisfy the desire of

investors in the secondary market. Adjustable rate mortgages with high average interest rates were among the most demanded loans to fill loan pools.

56. Countrywide often retained the right to service loans it pooled and sold. Fees for servicing drove profits even higher.

57. In a typical securitization transaction, loans were pooled together and transferred to a trust controlled by the securitizer. The trust then sold securities backed by the loans in the pool. Holders of securities obtained the right to a portion of the revenue from the pooled loans. These securitizations often involved pooling thousands of loans and the sale of thousands of shares.

58. Countrywide's reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars in 2003, 3.6 trillion dollars in 2005; and 3.8 trillion dollars in 2006.

59. Countrywide's business model increasingly focused on finding ways to create an even larger volume of the types of loans demanded by investors.

60. Countrywide became so eager to fill loan pools that it began to sell loans "forward", before the loans were even funded.

61. For example, Countrywide might agree that it would deliver 2000 ARMs meeting certain criteria to a purchaser two months later. These transactions were based upon the ability of high-ranking Countrywide officials to monitor loans in production and influence the loans ultimately made to conform to agreements already entered.

62. It is not hard to envision that sale of loan pools made up of loans that had not yet been made created a great deal of confusion as to the ownership of individual loans to the detriment of both consumers and investors.

63. It has now come to light, through sworn testimony of a BAC official in 2010, that it was customary for Countrywide to retain possession of Promissory Notes and related security agreements after the sale of loans into a loan pool for the secondary market.

64. This practice was contrary to the standard "pooling and servicing" agreement, which required the seller to assign the critical documents to the purchaser within a fixed period of time. (Generally forty-five to ninety days.)

65. This apparent breach of the master agreements has thrown into question the ownership of thousands of Countrywide loans since Countrywide disposed of approximately 96% of its loans to the secondary market.

66. It has now come to light that the Plaintiffs' loan was apparently transferred to a mortgage-backed security pool in keeping with Countrywide's overarching business plan, although they were not given notice of transfers of ownership, as required by the federal Truth-in-Lending Act and Regulation Z promulgated thereunder.

67. Had the Plaintiffs understood any of these facts and realized they were pawns in a massive plan to flood Wall Street with risky, high-cost loans, they would not have agreed to enter into their loan.

68. Most especially, if they had realized that Mr. Smith, whom they thought was working for their best interest, was being paid a financial incentive to get them into a certain loan product to fill a mortgage-backed security pool, they would not have entered the loan agreement.

69. At the time of the first payment, the Plaintiffs began to make the scheduled payments as they had been instructed.

70. In addition, Mr. Mitchell made extra payments totaling approximately $36,000.00

11

intended to reduce the principal indebtedness as he had planned with Mr. Smith; however, these payments do not appear to been credited to the Plaintiffs' loan balance in any of the documentation furnished to them.

71. In a well-publicized transaction, Bank of America acquired Countrywide in or around 2008. Countrywide loans came to be serviced by Bank of America Home Loans, a subsidiary of Bank of America, National Association ("BANA"). Ultimately BANA took over servicing.

72. In or about May of 2012, the Plaintiffs received correspondence from Bank of America Home Loans advising that an analysis of their escrow account revealed an escrow shortage of $23,954.51. (This letter is attached as "Exhibit C" to the Complaint.)

73. Of course, this was puzzling to Mr. Mitchell since there was no escrow account in the Plaintiffs' Note.

74. The correspondence went on to say that "the escrow portion of your (monthly) payment is changing to $1,532.25".

75. The correspondence showed a new "monthly home loan payment effective 05/20/12" of $4,179.29.

76. Mr. Mitchell had contractually agreed to maintain insurance on the property and pay the taxes and keep the lender's security free from peril and had done so since the inception of the loan.

77. Nothing in the Deed of Trust executed by the Plaintiffs at the closing (attached as "Exhibit D" to the Complaint) gave the leder the right to unilaterally create an escrow account.

12

78.   At the time that this began, Mr. Mitchell was a few months behind in payment of local real estate taxes but was in no jeopardy whatever of the property going to tax sale, being that he was considerably less than one year in arrears and local governments do not begin a tax sale process unless or until there is at least a three-year arrearage in payment.

79. Mr. Mitchell began to protest this action immediately and attempted to make his interest-only payments as scheduled.

80. He also requested information about what, if anything, had been paid to taxing authorities on his behalf, but could get no cogent answer.

81. Moreover, he demanded information about how there could be a $23,954.51 shortfall in an escrow account that did not exist.

82. BANA would not accept the scheduled payment amount and, instead, in a "pay it or else" gesture, referred the loan to its subsidiary, Recontrust Company, N.A., for foreclosure.

83.   On September 6, 2012, Recontrust sent a letter to each of the Plaintiffs pursuant to the Fair Debt Collection Practices Act, advising that it had been appointed substitute trustee under the Deed of Trust, that they owed a balance of $628,592.98 and that the property would be advertised for foreclosure sale, and that they could notify the substitute trustee in writing within thirty days if they disputed the validity or amount of the debt.

84. Mr. Mitchell sent letters on October 3, 2012, and November 12, 2012, questioning the validity and amount of debt and requesting information about the alleged escrow account; however, he never received a response to this correspondence as required by

13

the Fair Debt Collection Practices Act.

85. Neither BANA nor the trustee for the security pool moved forward with foreclosure at that point.

86. A stalemate continued in which the Mitchells refused to pay the increased payments and BANA refused to accept the payments called for in the Note.

87. Mr. Mitchell's attempts to get a resolution to the dispute only led to suggestions that he apply for a loan modification.

88. He attempted to do this; however, he ran into a bureaucratic nightmare of inability to get consistent communication, conflicting information, and repeated requests to submit sensitive financial information over and over.

89. Later, however, in or around 2014, the Plaintiffs received a notice that servicing of the loan had been transferred to Resurgent Capital Services, LP.

90. At some time after that the Plaintiffs received a Fair Debt Collection Practices Act letter from Arnold M. Weiss of Weiss Spicer Cash.

91. A short time later, the Plaintiffs received notice that the servicing of their loan had been transferred to Shellpoint.

92. More recently Plaintiffs received another Fair Debt Collection Practices Act letter from Mr. Weiss along with a Notice of Sale for November 18, 2014, at noon.

93. Unless the Court enjoins the pending sale, the Plaintiffs will lose their home and suffer irreparable injury.

**V. Claims for Relief**

**COUNT I: Fraud in the Inducement of the Loan Transaction**

14

94. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

95. The Mitchells were induced to enter the loan transaction by a complex scheme to mislead consumers like themselves about the real nature of "Interest Only ARMs" as part of a plan to sell thousands of loans onto the secondary mortgage market as set out above.

96. The Mitchells reasonably relied on active misrepresentations and concealment by Countrywide and its agent, Mr. Smith, which fraudulently induced them to enter into a very toxic and exploitative loan agreement, which has caused them significant damage and which should be rescinded by the Court.

97. Among other false and misleading statements and material omissions made to the Mitchells in the days and weeks leading up to the execution of the loan agreement on or about June 23, 2005, were the following:

- Mr. Smith led Mr. Mitchell to believe he could save money on interest by taking the extended "interest only" feature and making voluntary prepayments rather than entering a fully amortizing loan.

- Estimates of payment increase after resetting of the loan grossly, and purposefully, understated the payment increase on the change date.

- During the underwriting process Countrywide did not consider whether Mr. Mitchell would be able to afford the monthly payments once the loan recast to an amortizing monthly payment.

- The Mitchells were not informed that Mr. Smith, like other mortgage brokers or originators, was offered significant financial incentives to push customers

toward risky ARMs by misleading borrowers and obfuscating the true terms of the loan.

- The Mitchells were not informed that the primary reason for promoting the "Interest Only Arm" to potential borrowers like themselves was to fill up loan pools for sale on the secondary market.

- The Mitchells were not told that their minimum monthly payments would likely double upon reset to an amortizing loan.

**COUNT II: Violation of Regulation Z of the Truth-In-Lending Act**

98. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

99. By failing to notify the Plaintiffs of the change in ownership of their mortgage the defendants have violated the provisions of Regulation Z of the federal Truth-In-Lending Act found at 12 C.F.R.§ 226.39.

100.    Specifically, the Plaintiffs have recently come to learn of an assignment of the Deed of Trust they executed in December of 2004 from the Mortgage Electronic Registration System, Inc. ("MERS") as nominee for AME Financial Corporation to Bank of New York Mellon, f/k/a/ Bank of New York, as trustee for the investors or certificate holders for the loan pool that allegedly owns the loan on April 2, 2012.

101.    Plaintiffs were never notified of this transfer as required by law.

**COUNT III: Breach of Contract**

102.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

103.    By attempting to impose an escrow account on the Plaintiffs' loan, which was not

called for in the Note, Deed of Trust, or any other contractual agreement, and which directly contradicted the contractual agreement of the parties, Defendant BANA has breached the loan contracts entered between the Plaintiffs and AME on December 31, 2004.

104. By accelerating the Plaintiffs loan and initiating foreclosure when there had been no breach of the Note or any other breach giving rise to exercise of the power of sale under the Plaintiffs' Deed of Trust, BANA, Bank of New York Mellon, and Shellpoint have breached their loan agreement.

105. As a result of this breach, the Plaintiffs have suffered substantial economic damage and are faced with the potential loss of their home.

**COUNT IV: Breach of the Covenant of Good Faith and Fair Dealing**

106. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

107. By committing the acts complained of, BANA and Shellpoint have violated the common law covenant of good faith and fair dealing in carrying out the contractual loan servicing responsibilities associated with the loan transaction.

108. Specifically, by attempting to require the Plaintiffs to make escrow payments and collect monthly payments far in excess of those called for in the loan agreement, they have breached the covenant of good faith and fair dealing that is implied in every contractual relationship.

109. Further, by refusing or failing to give Plaintiffs an explanation of the alleged escrow shortage or what, if any, costs were paid by them on behalf of the Mitchells they have breached the covenant of good faith and fair dealing.

**COUNT V: Violations of the Tennessee Consumer Protection Act**

110.     The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

111.     Defendant BANA concealed and failed to disclose to the Plaintiffs that they were apparently acting as servicer for a mortgage-backed security pool of investors, that had significant financial disincentives or prohibitions from modifying or converting the Mitchells' loan to a fully amortizing loan and, therefore, had no incentive to cooperate with Mr. Mitchell's attempts to get a loan modification.

112.     The actions described above are in direct contravention of Tenn. Code Ann. § 47-18-104(14), which prohibits "causing confusion or misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a consumer transaction".

113.     These Defendants' acts, policies, and practices constitute unfair or deceptive acts or practices affecting the conduct of trade or commerce and violate the Tennessee Consumer Protection Act.

114.     Defendants' violation of the Tennessee Consumer Protection Act was willful and knowing.

**COUNT VI: Fair Debt Collection Practices Act Violation**

115.     The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

116.     Because Recontrust began to service the loan at a time it was in alleged default and the transfer of servicing rights was done to facilitate collection of the indebtedness, it is covered by the provisions of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*.

18

117.    Recontrust's failure to suspend collection efforts, including initiation of foreclosure proceedings without having conducted an investigation of the validity and amount of the debt constitutes a violation of the Fair Debt Collection Practices Act.

118.    Recontrust's failure to provide validation of the amount of the debt and other information requested on behalf of Ms. Caldwell constitute a violation of the Fair Debt Collection Practices Act.

### WHEREFORE, PREMISES CONSIDERED, THE PLAINTIFFS PRAY:

1. That a temporary restraining order be issued prohibiting any and all of the Defendants, their employees, agents, successors and/or assigns from proceeding with a scheduled foreclosure sale of the property located at 9375 Zachariah Cove in Memphis, Shelby County, Tennessee.

2. That proper service issue and be served upon the Defendants requiring them to answer this Complaint and Petition.

3. That the Court issue a Temporary Injunction prohibiting any and all of the Defendants, their employees, agents, successors and/or assigns from proceeding with a scheduled foreclosure sale of the property located at 9375 Zachariah Cove in Memphis, Shelby County, Tennessee until a trial on the merits of the claims raised in this action.

4. That the Court enter an order rescinding the Promissory Note and Deed of Trust executed by the Plaintiff regarding the property in question in December of 2004 and requiring the plaintiff to make restitution of the loan proceeds, with credit for all payments made toward restitution of the principal indebtedness.

5. That the Court enter judgment against Defendants BANA and Shellpoint and in favor of Plaintiffs for damages for breach of contract.

19

8. That the Court enter judgment against Defendants BANA and Shellpoint and in favor of Plaintiffs for breach of the covenant of good faith and fair dealing in carrying out the contractual servicing duties associated with the loan agreement.

9. That the Court enter a judgment against Defendant Bank of New York Mellon and in favor of Plaintiffs for damages resulting from their failure to provide the notification required by the Truth-In-Lending Act and Regulation Z promulgated pursuant thereto, including attorney fees.

10. That the Court enter judgment, including treble damages, against Defendants BANA and in favor of Plaintiff for willful violation of the Tennessee Consumer Protection Act.

11. That the Plaintiff be awarded all costs and expenses, including attorney fees, incurred as a result of this action, pursuant to Tenn. Code Ann. §47-18-101 *et seq.*

12. That the Plaintiffs be awarded all costs and expenses, including attorney fees, incurred as a result of this action, pursuant to 15 U.S.C. §1692, *et seq.*

10. For such other and further relief as to which the Plaintiffs may be entitled.

Respectfully Submitted,

**Brewer & Barlow PLC**

By: _____

Webb Brewer (B.P.R. No. 9030)
Steven E. Barlow (B.P.R. No. 023498)
Attorneys for Plaintiff
1755 Kirby Parkway, Suite 110
Memphis, TN 38120
(901) 757-3360
(901) 757-3361 (fax)

## AFFIDAVIT

STATE OF TENNESSEE
COUNTY OF SHELBY

I, Marvell Mitchell, having been duly sworn, state as follows:

1. I have reviewed the allegations of the Petition and Complaint and they are true and correct to the best of my knowledge, information and belief.

FURTHER, AFFIANT SAYETH NOT.

_____
MARVELL MITCHELL

Sworn and subscribed to before me this 14 day of _November_, 2014.

_____
NOTARY PUBLIC

My Commission Expires: Sept 21, 2016

GLORIA L. HARRIS
STATE
OF
TENNESSEE
NOTARY
PUBLIC
SHELBY COUNTY

MY COMMISSION EXPIRES:
September 21, 2016

21

CH-14-1680-1

## FIAT

TO THE CLERK OF THIS COURT:

Please issue the Temporary Restraining Order as prayed for in the attached Complaint prohibiting the Defendants from going forward with a scheduled foreclosure sale on the property at 9375 Zachariah Cove. in Memphis, Tennessee and set the matter of a temporary injunction for hearing on the 2ⁿᵈ day of Dec, 2014 at 10:00 o' clock A.M. ~p.m.~ /a.m.

Bond is set at $500.⁰⁰ .

A TRUE COPY-ATTEST
Donna L. Russell, Clerk & Master
By: _Jennie Hall_
D.C. & M.

_Walter L. Evans_
CHANCELLOR

Date: 11/17, 2014

# EXHIBIT A

MIN: 100075120040058228                    Loan Number: 2004005822

# InterestOnly ADJUSTABLE RATE NOTE

(One-Year LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

DECEMBER 31, 2004          NORCROSS                 GEORGIA
[Date]                     [City]                   [State]

      9375 ZACHARIAH COVE, MEMPHIS, TENNESSEE 38133
                    [Property Address]

1.   BORROWER'S PROMISE TO PAY
     In return for a loan that I have received, I promise to pay U.S. $ 611,000.00  (this amount is called "Principal"), plus interest, to the order of Lender. The Lender is  AME FINANCIAL CORPORATION, A GEORGIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
     I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.   INTEREST
     Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   5.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
     The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.   PAYMENTS
     (A) Time and Place of Payments
     I will make a payment on the first day of every month, beginning on MARCH 1, 2005      . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
     I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on FEBRUARY 1, 2035      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
     I will make my monthly payments at  4036 WETHERBURN WAY, NORCROSS, GEORGIA 30092

or at a different place if required by the Note Holder.
     (B) Amount of My Initial Monthly Payments
     My monthly payment will be in the amount of U.S. $ 2,736.77      before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.
     (C) Monthly Payment Changes
     Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
     (A) Change Dates
     The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of FEBRUARY, 2015       , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
     (B) The Index
     Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market (LIBOR), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
     If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

Conv
● MULTISTATE InterestOnly ADJUSTABLE RATE NOTE - ONE YEAR LIBOR INDEX
FE-4265 (0311)                    Page 1 of 4

Initials: [signature]

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding   TWO AND 250/1000
percentage points (   2.250  %) to the Current Index. The Note Holder will then
round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in
Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid
principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially
equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than  10.375  % or less than
2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by
more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate
will never be greater than  10.375  %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment
beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail
to me a notice of such change. The notice will include information required by law to be given to me and also the title and
telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest
Payment Due Date") shall be the first monthly payment date after the first Change Date.

5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as
a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use
my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly
payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when
my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term
when my payments consist of only interest. If the partial Prepayment is made during the period when my payments consist of
principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date
following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate
increase. .

6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or
other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan
charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already
collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by
reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction
will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and
interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a
certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all
the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or
delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to
be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.
Those expenses include, for example, reasonable attorneys' fees.

8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by
delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note
Holder a notice of my different address.

Conv.
◆ MULTISTATE InterestOnly ADJUSTABLE RATE NOTE - ONE YEAR LIBOR INDEX
FE-4285 (0311)1

Page 2 of 4                                                            Initials: _____

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.





US-02552.cw

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MARVELL R MITCHELL                            -Borrower

_____ (Seal)
                                                          -Borrower

_____ (Seal)
                                                          -Borrower

_____ (Seal)
                                                          -Borrower

[Sign Original Only]

Conv
● MULTISTATE InterestOnly ADJUSTABLE RATE NOTE - ONE YEAR LIBOR INDEX
FE-4265 (0311)                                      Page 4 of 4



DATE: DECEMBER 31, 2004
BORROWER: MARVELL R MITCHELL
CASE #:
LOAN #: 2004005822
PROPERTY ADDRESS: 9375 ZACHARIAH COVE, MEMPHIS, TENNESSEE 38133

**NON-CONFORMING AND NON-CONFORMING EXPANDED CRITERIA "INTEREST ONLY" FIXED PERIOD LIBOR ARMS**
This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

**HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED**

- After the first three, five, seven or ten years of your loan, as applicable, your interest rate will be based on an index plus a margin. Please ask us for our current interest rates and margins.
- The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.
- Your initial interest rate is not based on the index used to make later adjustments. If the initial interest rate is below the sum of the then-current index plus margin (the "fully indexed rate"), then the initial interest rate will be a "discounted" interest rate. If the initial interest rate is above the fully indexed rate, then it will be a "premium" interest rate. Please ask us for the amount of our current interest rate discounts and premiums.
- For the first three, five, seven or ten years of your loan, as applicable, your payment will be based on the interest rate, loan balance, and remaining loan term.

| | 3/1 ARM | 5/1 ARM | 7/1 ARM | 10/1 ARM |
|---|---|---|---|---|
| **HOW YOUR INTEREST RATE CAN CHANGE** | | | | |
| Your interest rate can change: | After 3 years and annually thereafter. | After 5 years and annually thereafter. | After 7 years and annually thereafter. | After 10 years and annually thereafter. |
| **HOW YOUR PAYMENT CAN CHANGE** | | | | |
| Each time your interest rate changes, the new interest rate will equal the sum of one index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br>• On the first change date, your interest rate can increase or decrease by 2.0%.<br>• On each subsequent change date, your interest rate will not increase by more than 2.0%.<br>• Your interest rate will not increase by more than 5.0% over the life of your loan. | • Your interest rate will be rounded to the nearest 1/8%.<br>• On the first change date, your interest rate can increase or decrease by 5.0%.<br>• On each subsequent change date, your interest rate will not increase by more than 2.0%.<br>• Your interest rate will not increase by more than 5.0% over the life of your loan. | • Your interest rate will be rounded to the nearest 1/8%.<br>• On the first change date, your interest rate can increase or decrease by 5.0%.<br>• On each subsequent change date, your interest rate will not increase by more than 2.0%.<br>• Your interest rate will not increase by more than 5.0% over the life of your loan. | • Your interest rate will be rounded to the nearest 1/8%.<br>• On the first change date, your interest rate can increase or decrease by 2.0%.<br>• On each subsequent change date, your interest rate will not increase by more than 2.0%.<br>• Your interest rate will not increase by more than 5.0% over the life of your loan. |
| Your monthly payments will cover interest only: | For the first 3 years of your loan. | For the first 5 years of your loan. | For the first 7 years of your loan. | For the first 10 years of your loan. |
| If you make voluntary principal payments during the interest only period: | Your required interest only payment will be reduced to reflect the decrease in your loan amount. | | | |
| Your monthly payments can change: | Each time the interest rate changes and can increase or decrease substantially based on the changes in the interest rate. | | | |
| | For the first 3, 5, 7 or 10 years of your loan, as applicable, your regular monthly payments will not reduce your loan balance. After this initial interest-only period, your monthly payments will begin to reduce your loan balance. This means that your payments could increase substantially when the interest-only period ends, even if your interest rate stays the same or goes down. | | | |
| You will be notified in writing: | At least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount, and loan balance. | | | |
| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan using an initial interest rate in effect on the first business day of January, 2004 and assuming the maximum periodic increases in rates and payments. | | | |
| **Examples of loans with a discounted interest rate (below sum of index and margin)** | | | | |
| Initial Interest Rate | 3.25 % | N/A % | N/A % | N/A % |
| Maximum Interest Rate | 9.25 % | N/A % | N/A % | N/A % |
| First Year Payment | $ 27.08 | $ N/A | $ N/A | $ N/A |
| Maximum payment | $ 83.02<br>in the 6th year | $ N/A<br>in the 6th year | $ N/A<br>in the 8th year | $ N/A<br>in the 11th year |
| **Examples of loans with a premium interest rate (above sum of index and margin)** | | | | |
| Initial Interest Rate | 4.125 % | 5 % | 5.125 % | 5.25 % |
| Maximum Interest Rate | 10.125 % | 10 % | 10.125 % | 10.25 % |
| First Year Payment | $ 34.37 | $ 41.66 | $ 42.71 | $ 43.75 |
| Maximum payment | $ 89.32<br>in the 6th year | $ 90.07<br>in the 6th year | $ 83.50<br>in the 8th year | $ 88.16<br>in the 11th year |

Note: To see what your payment would be, divide your mortgage payment by $10,000; then multiply the monthly payment by that amount. For example, the monthly payment for a $60,000 3/1 ARM with a premium interest rate would be: $60,000 / $10,000 = 6; 6 x $34.37 = $206.22.

_____    10/31/04    _____
MARVELL R MITCHELL          Date         Applicant          Date
Applicant

_____    _____    _____
Applicant                   Date         Applicant          Date

Conv
• Program Disclosure - Interest Only Fixed LIBOR ARM
FS-4264 (04/04)

fs4264.cn

# EXHIBIT B

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 2004005822                                          Date: DECEMBER 31, 2004
Creditor: AME FINANCIAL CORPORATION
Address: 4036 WETHERBURN WAY , NORCROSS, GEORGIA 30092

Borrower(s): MARVELL R MITCHELL

Address: 9375 ZACHARIAH COVE, MEMPHIS, TENNESSEE 38133

Lines containing an "x" are applicable.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 5.206 % | $ 670,604.09 | $ 605,430.12 | $ 1,276,034.21 | |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | | | | Monthly Beginning |
| 120 | 2,736.77 | 03/01/05 | | | | | | |
| 239 | 3,948.43 | 03/01/15 | | | | | | |
| 1 | 3,947.04 | 02/01/35 | | | | | | |

___ DEMAND FEATURE:  This obligation has a demand feature.

_X_ VARIABLE RATE FEATURE:  Your loan contains a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:
            _____ Credit life insurance and credit disability      _X_ Property Insurance      _____ Flood Insurance      _____ Private Mortgage Insurance
            You may obtain property insurance from any insurer that is acceptable to the Lender.
SECURITY: You are giving a security interest in: 9375 ZACHARIAH COVE, MEMPHIS, TENNESSEE 38133
            _____ The goods or property being purchased      _X_ Real property you already own.
FILING FEES: $
LATE CHARGE:  If payment is more than ___15___ days late, you will be charged _5.000___ % of the payment.
PREPAYMENT:  If you pay off early, you
___ may    _X_ will not    have to pay a penalty.
___ may    _X_ will not    be entitled to a refund of part of the finance charge.
ASSUMPTION:  Someone buying your property
___ may    _____ may, subject to conditions    _X_ may not    assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
_X_ "e" means an estimate    _____ all dates and numerical disclosures except the late payment disclosures are estimates.
          Each of the undersigned acknowledge receipt of a complete copy of this disclosure.  The disclosure does not constitute a contract or a commitment to lend.


_____    12/31/04
Applicant MARVELL R MITCHELL          Date          Applicant                          Date


_____                    _____
Applicant                             Date          Applicant                          Date


_____                    _____
Applicant                             Date          Applicant                          Date

** NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
Kept.lst                                                          DocMagic eFarms 800-649-1362

Lender: AME FINANCIAL CORPORATION, A GEORGIA CORPORATION
4036 WETHERBURN WAY
NORCROSS, GEORGIA, 30092

Re: MARVELL R MITCHELL
9375 ZACHARIAH COVE
MEMPHIS, TENNESSEE 38133

Date: DECEMBER 31, 2004
Loan Number: 2004005822

## ITEMIZATION OF AMOUNT FINANCED

| Ref HUD-1 Statement | | |
|---|---|---|
| | Amount given to you directly | $ 605,322.12 |
| 1001 1004 | Amount paid on your account Insurance Reserves Tax Reserves Other Reserves | |
| 1009 | Aggregate Adjustment | 0.00 |
| 803 804 903 809 1106 1108 1201 | Amount paid to others on your behalf: Appraisal Fee Credit Reporting Fee to: Lender Hazard Insurance Premium Document Preparation Fee to: Lender Notary Fee Title Ins. Premium Recording Fee | 65.00 25.00 |
| | FLOOD CERT TO AME FOR 1ST AMERICAN to: Lender | 18.00 |
| | Loan Proceeds to: | |
| | AMOUNT FINANCED | $ 605,430.12 |
| | Prepaid Finance Charge | $ 5,569.88 |

| | Itemization of Prepaid Finance Charge: | | • Loan Amount $ 611,000.00 |
|---|---|---|---|
| 801 | Loan Origination Fee | $ | |
| 802 | Loan Discount Fee | | |
| 806 | Tax Service Fee  to: Lender | 82.00 | |
| 901 | Prepaid Interest ( 26    days) @    5.375 % per annum | 2,339.38 | |
| 902 | Mtge. Ins. Premium | | |
| 1002 | Mtge. Ins. Reserves | | |
| 808 | Origination Fee | | |
| | ADMIN FEE DUE AME to: Lender | 376.00 | |
| | TRANSACTION FEE to: Lender | 150.00 | |
| | ESCROW WAIVER FEE DUE BROKER to: Lender | 1,527.50 | |
| | ATTORNEY FEE to: Service Provider | 600.00 | |
| | DELIVERY FEE DUE AME to: Lender | 100.00 | |
| | PROCESSING FEE TO to: Lender | 395.00 | |
| | Total Prepaid Finance Charge | $ 5,569.88 | |

This form does not cover all items you will be required to pay in cash at settlement, for example, deposits in escrow for real estate taxes and insurance may be different.  You may wish to inquire as to the amounts of such other items.  You may be required to pay other additional amounts to be settled.

☐  All disclosures are estimates

The undersigned acknowledge receiving and reading a completed copy of this disclosure.

X _Marvell R. Mitchell_____   12/31/04
(Borrower) MARVELL R MITCHELL        (Date)

(Borrower)                          (Date)        (Borrower)                          (Date)

(Borrower)                          (Date)        (Borrower)                          (Date)

GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES           DocMagic Eff. xxxx  800-649-1362
GD.bir.1.xm

# EXHIBIT C




**Bank of America**

Home Loans

| | |
|---|---|
| 1 of 6 | |

Customer Service
PO Box 5170
Simi Valley, CA 93062-5170

Statement date 03/23/2012
**Account Number 079841856**
Property address
9375 Zachariah Cove



0005534 01 AT 0.371 **AUTO  T2 1 2782 38133-0970
PO XW AG 01K------0--2-S- C0000031 1N 1 P05535
MARVELL R MITCHELL
9375 Zachariah Cv
Memphis TN 38133-0970

ıllıllılılıllıIIIılıllıllıllıllıllIIIIılıllı

FOR CUSTOMER SERVICE: 1.800.669.6607

---

**IMPORTANT MESSAGE ABOUT YOUR LOAN**

Enclosed is an escrow analysis for your loan. The purpose of this notification is to advise you that the escrow portion of your payment is changing to $1,532.25 effective 05/2012.

**WHAT THIS MEANS**

This notification is for informational purposes only. Your next billing statement will arrive shortly. It will provide payment coupons for each of your available payment amounts (if applicable) and will include the new escrow payment amount of $1,532.25.

**WHAT YOU NEED TO DO**

Please keep this notification for your records.

**ACCOUNT ACTIVITY**

| Date | Description | Interest | Escrow | Other Unapplied | Total |
|---|---|---|---|---|---|
| 02/29/2012 | Misc posting | | | -132.69 | -132.69 |
| 03/01/2012 | January payment | 2,647.04 | 1,532.27 | .69 | 4,180.00 |
| 03/02/2012 | Misc posting | | .69 | | -.69 |
| | **Ending balance** | $590,967.46 | -$23,954.51 | | |

**NOTE: The ending balance is probably not the same as the amount to payoff your loan.  For payoff information, you may use our 24-hour automated information system at 1.800.669.6607.

---



Bank of America, N.A. Member FDIC. Equal Housing Lender. © 2012 Bank of America Corporation. Trademarks are the property of Bank of America Corporation. All rights reserved.

0005534 0013714

2 of 6

3 of 6

**Bank of America**

Home Loans

| Account Number 079841856 | Statement date |
|---|---|
| Property address | 03/23/2012 |
| 9375 Zachariah Cove | |
| Marvell R Mitchell | |

## Escrow Account Review

| ESCROW EXPLAINED | Part of your monthly loan payment goes into an account to pay your property taxes and insurance premiums. During the year, payments are made out of this account when bills come due. This notice describes any changes needed in your monthly payment to maintain enough money in your escrow account to pay these bills. In our step-by-step analysis, we determine the data shown below to calculate your new escrow payment. |
|---|---|

*See below for:*
* an in-depth explanation of each step of your escrow analysis     • side-by-side comparison of last year's projected and actual data

| SUMMARY | | |
|---|---|---|
| Base amount needed *(see Step 1)* | The expected monthly amount needed to pay your property taxes and insurance premiums | $989.98 |
| Shortage payment *(see Step 2)* | The monthly amount you must pay into your escrow account to keep the balance from falling below zero during the year | $542.27 |
| Reserve requirement *(see Step 3)* | The monthly amount allowed by federal law for unexpected tax and insurance increases and other costs | $0.00 |
| New monthly escrow payment *(see Step 4)* | | $1,532.25 |
| New monthly home loan payment effective 05/2012 *(see Step 4)* | | $4,179.29 |

## HOW WE CALCULATE YOUR ESCROW PAYMENT

**STEP 1**     Determine base amount needed for the year

| Escrow items | Amount needed | Frequency in months | Monthly amount needed | |
|---|---|---|---|---|
| County taxes | $8,690.43 | 12 | $724.20 | |
| City taxes | 3,189.35 | 12 | 265.78 | |
| Total monthly base payment amount | | | | $989.98 |

**STEP 2**     Determine lowest projected balance

In the chart located below, we project the amounts you will pay into your escrow account next year and the amounts we will pay out for your insurance and tax bills. Remember, these figures are only projections and may not reflect the actual payments made at the time they are due.

| Month | Escrow deposit(s) | Tax payment(s) | Insurance payment(s) | MIP/PMI payment(s) | Balance |
|---|---|---|---|---|---|
| Beginning balance | | | | | -$19,357.70 D |
| May 2012 | 989.98 | | | | -18,367.72 |
| June 2012 | 989.98 | | | | -17,377.74 |
| July 2012 | 989.98 | | | | -16,387.76 |
| August 2012 | 989.98 | | | | -15,397.78 |
| September 2012 | 989.98 | | | | -14,407.80 |
| October 2012 | 989.98 | | | | -13,417.82 |
| November 2012 | 989.98 | | | | -12,427.84 |
| December 2012 | 989.98 | 11,879.78 | | | -23,317.64 * |
| January 2013 | 989.98 | | | | -22,327.66 |
| February 2013 | 989.98 | | | | -21,337.68 |
| March 2013 | 989.98 | | | | -20,347.70 |
| April 2013 | 989.98 | | | | -19,357.72 |
| Ending balance | | | | | -$19,357.72 |

| Lowest projected balance | -$23,317.64 |
|---|---|
| Shortage payment amount | $542.27 |

*  Lowest projected balance (LPB)

D-The letter (D) beside the escrow balance amount indicates that your mortgage payments are delinquent, and the Beginning balance from Step 2 of HOW WE CALCULATE YOUR ESCROW PAYMENT will not match the Actual Ending balance from the LAST YEAR IN REVIEW section.

We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

## PAYMENT INSTRUCTIONS

Please
• don't send cash
• don't staple the check to the payment coupon
• don't include correspondence
• include coupon with payment

Write your account number on the check or money order.

Write in any additional amounts you are including.

Make your check payable to Bank of America, N.A.
Attn: Remittance Processing
PO Box 15222
Wilmington, DE 19886-5222

| Account number     079841856     (2) |
|---|
| Marvell R Mitchell |
| 9375 Zachariah Cove |
| Memphis, TN 38133 |

Escrow shortage due **May 1, 2012**     $23,317.64

1/82

Bank of America, N.A.
PO BOX 15222
WILMINGTON, DE 19886-5222

| | |
|---|---|
| N/A | |
| N/A | |
| Check total | |

07984185620500233176400233176 4

⑈586991002⑈07984185⑈

0005534 0013715

At the time of analysis, Bank of America, N.A. assumes that all scheduled mortgage payments will be made to the effective date of your new payment.

You, of course, have the option to pay your anticipated shortage in full. *(See Step 4 for more information.)*

**STEP 3**   Determine reserve requirement
Federal law allows for the collection of a reserve amount to maintain a cushion for unexpected tax and/or insurance increases and other costs. The reserve used for this period is shown below.

| | | |
|---|---|---|
| Lowest projected balance *(see step 2 above)* | -$23,317.64 | |
| Total reserve requirement (00.0% of the base amount) * | .00 | |
| Additional amounts required | .00 | |
| Monthly reserve requirement ($0.00 divided by 43) | | $0.00 |
| Available overage | $0.00 | |

\* Base amount equals the total of payments anticipated to be paid out of the escrow account during the year but excludes PMI/MIP amounts.

**STEP 4**   Determine monthly payments
Calculation of monthly escrow payment

| | | |
|---|---|---|
| Base amount needed for taxes and/or insurance *(see Step 1)* | $989.98 | |
| Shortage payment *(see Step 2)* | 542.27 | |
| Reserve requirement *(see Step 3)* | .00 | |
| Total monthly escrow payment | | $1,532.25 |

Calculation of monthly home loan payment

| | | |
|---|---|---|
| Principal and/or interest | $2,647.04 | |
| Total monthly escrow payment | 1,532.25 | |
| Total monthly home loan payment effective  05/2012 | | $4,179.29 |

If you choose to pay your shortage in full, your payment will be reduced by the shortage amount of $542.27, leaving you with a payment of $3,637.02.

LAST YEAR
IN REVIEW

| Current analysis compared to previous | Monthly amount | |
|---|---|---|
| Amount needed for taxes and insurance | *Last analysis* | *This analysis* |
| County taxes | $724.20 | $724.20 |
| City taxes | 265.76 | 265.78 |
| Total base escrow payment | $989.98 | $989.98 |
| Shortage payment | 542.29 | 542.27 |
| Reserve requirement | .00 | .00 |
| Rounding amount | .00 | .00 |
| Monthly escrow payment | $1,532.27 | $1,532.25 |
| Principal and/or interest | $2,647.04 | $2,647.04 |
| Monthly escrow payment | 1,532.27 | 1,532.25 |
| Total payment amount | $4,179.31 | $4,179.29 |

Summary of escrow change
As shown, your base escrow amount remained the same. Your reserve percentage remained unchanged. Your reserve payment remained unchanged. The result of these issues caused your total escrow payment to decrease. Additionally, you were left with a shortage.

A side-by-side comparison of last year's projected escrow account activity and actual activity can be found below.

How we post your payment: All accepted payments of principal a interest will be applied to the longest outstanding installment due, unless otherwise expressly prohibited or limited by law. If you submit an amount in addition to your scheduled monthly amount, will apply your payments as follows: (i) to outstanding monthly payments of principal and interest, (ii) escrow deficiencies, (iii) la charges and other amounts you owe in connection with your loan and (iv) to reduce the outstanding principal balance of your loan. Please specify if you want an additional amount applied to future payments, rather than principal reduction.
Postdated checks will be processed on the date received unless a loan counselor agrees to honor the date written on the check as a condition of a repayment plan. Payments by phone received by 8:0 PM Pacific Time on a business day will be effective the same day Payments by phone received after 8:00 PM Pacific Time or on a nonbusiness day/holiday will be applied to your account no later t the next business day.

For all full month payment periods, interest is calculated on a monthly basis. Accordingly, interest for all full months, including February, is calculated in 30/360 of annual interest, irrespective o the actual number of days in the month. For partial months, intere is calculated daily on the basis of a 365 day year.

5 of 6

**Bank of America** 

Home Loans

Last year's escrow payments

| Projected | | | | | Actual | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Activity | Paid in | Paid out | Balance | Date | Activity | Paid in | Paid out | Balance |
| | Beginning balance | | | -$23,955.20 | | Beginning balance | | | -$27,019.74 |
| 02/01/2012 | Feb Payment | 1,532.27 | | -22,422.93 * | 02/01/2012 | Dec Payment | 1,532.27 | | -25,487.47 * |
| 03/01/2012 | Mar Payment | 1,532.27 | | -20,890.66 | 03/01/2012 | Jan Payment | 1,532.27 | | -23,955.20 |
| 04/01/2012 | Apr Payment | 1,532.27 | | -19,358.39 | 03/02/2012 | Misc posting | .55 | | -23,954.51 |
| 05/01/2012 | May Payment | 1,532.27 | | -17,826.12 | 03/23/2012 | Feb Payment | 1,532.27 | | -22,422.24 P |
| 06/01/2012 | Jun Payment | 1,532.27 | | -16,293.85 | 03/23/2012 | Mar Payment | 1,532.27 | | -20,889.97 P |
| 07/01/2012 | Jul Payment | 1,532.27 | | -14,761.58 | | Ending balance | | | -$20,889.97 D |
| 08/01/2012 | Aug Payment | 1,532.27 | | -13,229.31 | | | | | |
| 09/01/2012 | Sep Payment | 1,532.27 | | -11,697.04 | | | | | |
| 10/01/2012 | Oct Payment | 1,532.27 | | -10,164.77 | | | | | |
| 11/01/2012 | Nov Payment | 1,532.27 | | -8,632.50 | | | | | |
| 12/01/2012 | Dec Payment | 1,532.27 | | -7,100.23 | | | | | |
| 12/02/2012 | County taxes | | 8,690.43 | -15,790.66 | | | | | |
| 12/02/2012 | City taxes | | 3,189.35 | -18,980.01 | | | | | |
| 01/01/2013 | Jan Payment | 1,532.27 | | -17,447.74 | | | | | |
| | Ending balance | | | -$17,447.74 | | | | | |

* Lowest projected balance

D - The letter (D) beside the escrow balance amount indicates that your mortgage payments are delinquent, and the Beginning balance from Step 2 of HOW WE CALCULATE YOUR ESCROW PAYMENT will not match the Actual Ending Balance from the LAST YEAR IN REVIEW section.

P - The letter (P) beside an amount indicates that the payment or disbursement has not yet occurred but is estimated to occur as shown.

At the time of analysis, Bank of America, N.A. assumes that all scheduled mortgage payments will be made to the effective date of your new payment.

6 of 6

EXHIBIT D

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896



# *Tom Leatherwood*

## Shelby County Register

As evidenced by the instrument number shown below, this document
has been recorded as a permanent record in the archives of the
Office of the Shelby County Register.



160 N. Main St., Suite 519 ~ Memphis, Tennessee 38103 ~ (901) 545-4366
http://register.shelby.tn.us

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

Prepared by and returned to:
The Orange Law Firm, PC
6750 Poplar Avenue #419
Memphis, TN 38138

This Instrument Was Prepared By:

After Recording Return To:
AME FINANCIAL CORPORATION
4036 WETHERBURN WAY
NORCROSS, GEORGIA 30092
Loan Number: 2004005822

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

The maximum principal indebtedness for Tennessee recording tax purposes is $ 611,000.00

MIN: 100075120040058228

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated DECEMBER 31, 2004 , together with all Riders to this document.
(B) "Borrower" is MARVELL R. MITCHELL INDIVIDUAL
        (A MARRIED MAN)

Borrower is the trustor under this Security Instrument.
(C) "Lender" is AME FINANCIAL CORPORATION

Lender is a GEORGIA CORPORATION           organized
and existing under the laws of GEORGIA
Lender's address is 4036 WETHERBURN WAY, NORCROSS, GEORGIA 30092

(D) "Trustee" is ~~XXXXXXXXXXXXX~~ CARLTON W. ORANGE, ESQ.

a resident of Memphis        , Tennessee.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

Borrower Initials: _____  X _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01                   Page 1 of 14            DocMagic eFormms 800-649-1362
www.docmagic.com

Tn3043.mzd.1.tem

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

(F)  "Note" means the promissory note signed by Borrower and dated DECEMBER 31,  2004
The Note states that Borrower owes Lender SIX  HUNDRED  ELEVEN  THOUSAND
                                   Dollars (U.S. $ 611,000.00               ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
FEBRUARY 1, 2035                          .
(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider        ☐ Condominium Rider           ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.
(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.
(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
(M)  "Escrow Items" means those items that are described in Section 3.
(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in
lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note,
plus (ii) any amounts under Section 3 of this Security Instrument.
(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument,
"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan"
even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that
party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and
assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of
the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

Borrower Initials:

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic eForms 800-649-1362
Form 3043 1/01                                      Page 2 of 14                              www.docmagic.com

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                           of                    SHELBY                           :
[Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".

### Derivation Clause

The instrument constituting the source of the Borrower's interest in the foregoing described property was
a   WARRANTY DEED      recorded      in  02 058B79
in the Register's Office of    SHELBY                         County, Tennessee.

which currently has the address of  9375 ZACHARIAH COVE
                                                               [Street]

MEMPHIS                        , Tennessee    38133        ("Property Address"):
[City]                                               [Zip Code]

TO HAVE AND TO HOLD, the aforedescribed property, together with all the hereditaments and appurtenances thereunto belong to, or in anywise appertaining, unto the Trustee, its successors in trust and assigns, in fee simple forever.

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS            DocMagic eForms 800-649-1362
Form 3043 1/01                                              Page 3 of 14                                    www.docmagic.com

Tn3043.mzd.3.wm

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                     DocMagic *800-649-1362*
Form 3043 1/01                                       Page 4 of 14                                        www.docmagic.com

a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01                                    Page 5 of 14

DocMagic &#8482; 800-649-1362
www.docmagic.com

Tn3043.txt5.tem

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Borrower Initials:

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01

Page 6 of 14

DocMagic €Ωτσσσσ 800-649-1387
www.docmagic.com

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

7.  Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01                                    Page 7 of 14

DocMagic EForms 800-649-1362
www.docmagic.com

Tn3043.mzd.7.tem

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01
Page 8 of 14

DocMagic *e*Forms* 800-649-1362
www.docmagic.com

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"):  (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01
Page 9 of 14
DocMagic eForms 800-649-1362
www.docmagic.com

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01                                   Page 10 of 14                              DocMagic &#8482; 800-649-1362
                                                                                           www.docmagic.com

must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower Initials: _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01                                    Page 11 of 14

DocMagic ℰℱ𝓇𝓂𝓈 800-649-1362
www.docmagic.com

Tn3043.mrl.11.tem

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by Applicable Law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in Section 15. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant at will of the purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Borrower Initials:

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01                                    Page 12 of 14

DocMagic eFerms 800-649-1362
www.docmagic.com

Tn3043.mzd.12.tem

Tom Leatherwood, Shelby County Register of Deeds, Instr. # 05007896

24.  Substitute Trustee.  Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25.  Waivers.  Borrower waives all right of homestead, equity of redemption, statutory right of redemption and relinquishes all other rights and exemptions of every kind, including, but not limited to, a statutory right to an elective share in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has executed this Security Instrument.

_____ (Seal)             _____ (Seal)
MARVELL R MITCHELL           -Borrower                                     -Borrower

_____ (Seal)             _____ (Seal)
                             -Borrower                                     -Borrower

_____ (Seal)             _____ (Seal)
                             -Borrower                                     -Borrower

Witness:                              Witness:

_____             _____

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS            DocMagic ℰℱℴʳᵐˢ 800-649-1362
Form 3043 1/01                        Page 13 of 14                                   www.docmagic.com

Tn3043.mzd.13.tem

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

State of Tennessee, )
County of *Shelby* )

On this 31st day of December, 2004, before me personally appeared
MARVELL R MITCHELL AND LEDELLE J. MITCHELL

to me known to be the person (or persons) described in and who executed the foregoing instrument, and acknowledged
that he/she/they executed the same as his/her/their free act and deed.

_____
Notary Public

My commission expires: 12/20/05

TENNESSEE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3043 1/01
Page 14 of 14

DocMagic ℂℱℛ𝔪𝔰 800-649-1362
www.docmagic.com

Ts3043.mrd.14.tem

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

Land situated in Shelby County, Tennessee:

Lot 206, Phase IX, Section A, Plantation Estates Davieshire Subdivision, as shown on Plat of record in Plat Book 142, Page 6, in the Register's Office of Shelby County, Tennessee, to which Plat reference is hereby made for a more particular description of said property.

(0411068,PFD/041106B/20)

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

Assessor's Parcel Number:

After Recording Return To:
AME FINANCIAL CORPORATION
4036 WETHERBURN WAY
NORCROSS, GEORGIA 30092

Prepared By:

—————— [Space Above This Line For Recording Data] ——————

# FIXED/ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

DOC ID #: 2004005822

THIS FIXED/ADJUSTABLE RATE RIDER is made this      31st         day of DECEMBER
2004         , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
AME FINANCIAL CORPORATION, A GEORGIA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:
        9375 ZACHARIAH COVE, MEMPHIS, TENNESSEE 38133
                        [Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE
TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT
BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

*Conv*
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
FE-4266 (0309)                    Page 1 of 4                        Initials

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of   5.375 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of FEBRUARY, 2015   , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO  AND 250/1000                     percentage points (   2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.375 % or less than    2.250%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying preceding 12 months. My interest rate will never be greater than 10.375 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

Conv
•  MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
FE-4266 (0309)                    Page 2 of 4                              Initials: ___

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

Conv
♦ MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
FE-4266 (0309)                    Page 3 of 4                    Initials:

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05007896

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
MARVELL R MITCHELL                -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

Conv
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
FE-4266 (0309)          Page 4 of 4

**RESTRAINING BOND**

No. _CH-14-1680-1_

SHELBY COUNTY
CHANCERY COURT
FILED
NOV 17 2014
DONNA L. RUSSELL, C & M
TIME: _11:11_   BY: _____

WE _Marvell and Dodelle Mitchell_ _____

_____ as principal and _Webb A. Brewer_ ,

_Brewer & Barlow, PLC_ as surety acknowledge ourselves indebted to _New Penn_

_Financial, LLC, et al_ in the sum of _Five hundred Dollars_ ($5,00.00) Dollars

The condition of the above Bond is such, that whereas the said _Marvell and Ladelle_

_Mitchell_ Plaintiff(s) this day filed _their_ Bill in the Chancery Court of Shelby County against the said

_New Penn Financial, et al_ _____ Defendant(s) and obtained a fiat for the issuance of the

Restraining Order, in accordance with said fiat, upon the execution of the Bond. Now, if the said Plaintiff(s) shall pay

such damages and costs as may be awarded by the Chancery Court in dismissing the complaint, then this obligation to

be void, otherwise to remain in full force and effect.

Witness our hands and seals this, the _17th_ day of _November_ 20 _14_

_Webb A. Brewer_ #5030
_Webb A. Brewer_ .
_Brewer & Barlow, PLC_
_1755 Kirby Parkway, Ste 110_
_Memphis, TN 38120_
_(901) 752-3360_

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X ☐ Agent ☐ Addressee<br>B. Received by ( Printed Name )  C. Date of Delivery<br>H. Pieb RS   11-20-14 |
| 1. Article Addressed to:<br><br>nnessee Department of State<br>ision of Business Services<br>ttn: Summons<br>12 Eighth Avenue North<br>h Floor, William R. Snodgrass Tower<br>ashville, TN 37243 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>3. Service Type<br>☐ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D. |
| | 4. Restricted Delivery? (Extra Fee)   ☐ Yes |
| 2. Article Number<br>(Transfer from service label)   7011 1150 0000 5462 2278 | |
| PS Form 3811, August 2001   Domestic Return Receipt   102595-03-P-4081 | |

CH-14-1680-1

CH - 14 - 1680 - 1